USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/26/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                   :
MOUSSA KOUYATE, *individually and on behalf of all*                :
*others similarly situated*,                                       :
                                                                   :          1:24-cv-6223-GHW
                                                    Plaintiff,      :
                                                                   :          MEMORANDUM OPINION &
                              -against-                             :          ORDER
                                                                   :
THE HARVARD DRUG GROUP LLC *d/b/a*                                  :
RUGBY LABORATORIES,                                                :
                                                                   :
                                                    Defendant.      :
                                                                   :
------------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

The Harvard Drug Group LLC ("Defendant") manufactures, markets, and sells over-the-counter ("OTC") pharmaceuticals throughout the United States, including in New York. One of Defendant's products is an OTC acne wash made with benzoyl peroxide, which is commonly used to treat acne. The U.S. Food and Drug Administration expressly approves of the use of benzoyl peroxide in OTC acne products.

In approximately 2024, Moussa Kouyate ("Plaintiff") purchased one of Defendant's acne washes from his local pharmacy. The product's label listed benzoyl peroxide as an active ingredient, but did not disclose that the benzoyl peroxide could degrade into benzene, a known byproduct of benzoyl peroxide and an alleged carcinogen. Based on Plaintiff's review of the label, he believed that the acne wash did not contain any benzene and he bought it. Plaintiff then put his expectations to the test: he submitted the product to an independent laboratory for testing to see if it, in fact, contained benzene. According to Plaintiff, the testing found unsafe levels of benzene in Defendant's product.

Plaintiff sued, asserting claims for violations of Section 350 of the New York General

Business Law, N.Y. Gen. Bus. L. § 350 ("Section 350")—which prohibits false advertising—and for common law fraud based on Defendant's alleged failure to disclose that the acne wash contains benzene, or that the benzoyl peroxide in the product could degrade to form benzene. Plaintiff also asserts a claim for negligence *per se* based on Defendant's alleged violation of a state criminal law that bans the sale of misbranded and adulterated drugs.

Defendant moved to dismiss the complaint. Defendant argues that the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* (the "FDCA")—which regulates the sale and labeling of OTC acne products made with benzoyl peroxide—preempts Plaintiff's state law claims. According to Defendant, it cannot be sued under state law for conduct that does not violate the FDCA, including for the omission of a warning about benzene that the federal law does not require. Nothing about its acne wash, Defendant contends, violates the FDCA.

Defendant's motion to dismiss is granted. Because the FDCA does not require Defendant to disclose that its acne wash contains or could degrade to form benzene, Plaintiff's Section 350 and fraud claims based on those omitted warnings are preempted. Plaintiff's negligence *per se* claim is also preempted because Defendant's alleged sale of an acne product made with benzoyl peroxide—an FDA approved ingredient—that degrades to form benzene does not violate federal law.

## I.     BACKGROUND[1]

### A.  Plaintiff Discovers Benzene in Defendant's Product

The Harvard Drug Group LLC is a Michigan limited liability company that manufactures, markets, and sells acne medication products formulated with the chemical compound benzoyl peroxide. Compl. ¶¶ 10, 14, 47. Defendant sells its products under the brand name Rugby

---

[1] The facts are taken from Plaintiff's Class Action Complaint, Dkt. No. 1 ("Compl."), and are accepted as true for the purposes of this motion. *See, e.g.*, *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Laboratories. *Id.* ¶ 1. One of Defendant's products is its Rugby Laboratories Benzoyl Peroxide Wash USP 10% (the "BPO Product"). *Id.* An active ingredient in the BPO Product is benzoyl peroxide, which is used to treat acne. *Id.* ¶¶ 15, 47.

Moussa Kouyate ("Plaintiff") is a resident and citizen of The Bronx, in New York City. *Id.* ¶ 8. In approximately 2024, Plaintiff was prescribed the BPO Product by his physician. *Id.* He "filled that prescription at a pharmacy" in the Bronx. *Id.* Plaintiff "reviewed the accompanying labels and disclosures" on the product before purchasing it. *Id.* An example of the BPO Product's label is shown below:



*Id.* ¶ 77. Plaintiff alleges that he "understood" the BPO Product's "labels and disclosures" to be "representations and warranties by the manufacturer that the BPO Product was properly manufactured, free from defects, safe for its intended use, and not adulterated or misbranded." *Id.* ¶ 8. As illustrated, however, the product's label does not contain express representations to that effect. Nonetheless, Plaintiff alleges that he "relied on these representations and warranties in deciding to purchase the BPO Product manufactured by Defendant." *Id.*

After purchasing the BPO Product, Plaintiff "subjected the BPO Product to testing by an independent laboratory." *Id.* The laboratory tested the BPO Product at room temperature, the temperature at which the label recommends storing the BPO Product. *Id.* ¶ 19, 77. The test

detected benzene—a known carcinogen—in the BPO Product. *Id.* ¶¶ 8, 19, 44.[2]  The specific BPO Product that Plaintiff purchased was "shown to contain benzene at levels that vastly exceed" 2 parts per million ("ppm"). *Id.* ¶ 19.

The results of Plaintiff's testing were consistent with the findings of another laboratory, Valisure LLC ("Valisure"). *Id.* ¶¶ 17, 38.  Valisure operates an accredited analytical laboratory and is "an industry leader in independent chemical testing of medications[.]" *Id.* ¶ 38.  Valisure tested "66 acne treatment products containing benzoyl peroxide (including Rugby Laboratories' BPO Products), all of which tested positive for benzene at various levels." *Id.* ¶ 17.  Accordingly, in March of 2024, Valisure "submitted a public citizens petition to the FDA requesting a recall and suspension of sales of benzoyl peroxide from the U.S. market." *Id.* ¶ 37.

Based on this testing, Plaintiff alleges that "[c]ollectively, all lots of Defendant's BPO Products contain and/or or [sic] systematically degrade to form benzene." *Id.* ¶ 17.  However, he complains, nowhere on the BPO Product's "labeling or anywhere in its marketing [disclosed] that the BPO Product contains benzene or can degrade to form benzene." *Id.* ¶¶ 45, 62.

### B.  The Health Risks of Benzene and the FDA's Related Regulations

"The health hazards of benzene have been recognized for over one hundred years." *Id.* ¶ 21.  For example, benzene has been "'found to be carcinogenic to humans' by the International Agency for Research on Cancer," which first evaluated benzene in 1974, "and was found to be carcinogenic to humans . . . a finding that has stood since that time." *Id.* ¶ 27.  "The FDA also recognizes that '[b]enzene is a carcinogen that can cause cancer in humans'" and classifies benzene as a type of solvent "that should be 'avoided' in drug manufacturing." *Id.* ¶ 28.

It is also "well known that [benzoyl peroxide] degrades to form benzene when exposed to heat over time." *Id.* ¶ 63.  "This process was first reported in scientific literature as early as

---

[2] "Benzene is used primarily as a solvent in the chemical and pharmaceutical industries." Compl. ¶ 21.

1936." *Id.* One 1993 study concluded that benzoyl peroxide-based products can degrade to form "significant amounts of benzene" when heated, and another 1994 study that heated "various BPO-containing products" found "substantial benzene formation at elevated temperatures . . . ." *Id.* ¶ 67–68. The issue of benzoyl peroxide "decomposition into benzene has been previously identified and acted upon in industries other than in the acne treatment product industry." *Id.* ¶ 64.

According to the Complaint, the FDA has been aware—for some time—of the potential health risks of drugs made with benzoyl peroxide. For context, the FDA regulates OTC drugs through a "monograph," which is a set of comprehensive regulations governing the manufacture, sale, and labeling of OTC drugs, including acne products. As early as 1991, in response to a 1981 study "that raised a safety concern regarding benzoyl peroxide," the FDA amended the monograph for OTC topical acne drug products. *Id.* ¶ 70. And by 2010, the FDA "published a final monograph on benzoyl peroxide along with summarizing results from further studies on the potential carcinogenicity of benzoyl peroxide and actions of the FDA Advisory Committee." *Id.* ¶ 71. The final monograph stated that "[t]he Committee recommended . . . that the known safety data regarding the tumor promoting potential of benzoyl peroxide should be communicated to consumers" but, "[b]ecause this data was inconclusive, the Committee unanimously agreed that the word, 'cancer' should not be included in the labeling of acne drug products containing benzoyl peroxide." *Id.* "The Committee was concerned that the word 'cancer' would cause consumers to avoid using these products (even though the data were inconclusive)." *Id.*

More recently, in December of 2022, the FDA "issued a statement alerting manufacturers to the risk of benzene contamination" in products made with benzoyl peroxide, which recommended that "any drug product containing more than 2 ppm benzene" should be recalled. *Id.* ¶ 48. A year later, on December 27, 2023, "in response to reports of benzene contamination in various drug products, the FDA issued an 'Alert,' stating: 'Drug manufacturers with a risk for benzene

5

contamination should test their drugs accordingly and should not release any drug product batch

that contains benzene above 2 ppm[.] . . . If any drug product batches with benzene above 2 ppm

are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation

of a recall[.]" *Id.* ¶ 31. Nonetheless, the FDA continues to approve the use of benzoyl peroxide as

an active ingredient in OTC topical acne drug products, and has not updated its final monograph to

include warnings that benzoyl peroxide may degrade into benzene.

### C. Plaintiff's Claims Against Defendant

On August 16, 2024, Plaintiff commenced this putative class action lawsuit. Plaintiff asserts

three claims against Defendant, namely, a claim for violations of Section 350 of the New York

General Business Law, NY Gen. Bus. L. § 350 ("Section 350"), a claim for common law fraud, and a

claim for negligence *per se*.[3]

With respect to the Section 350 claim, Plaintiff's claim is based on the allegation that

Defendant misleadingly failed to disclose on the BPO Product's "labeling or anywhere in its

marketing that the BPO Products' contains benzene or can degrade to form benzene" (the

"Benzene Omissions"). *See* Compl. ¶¶ 45, 77, 107. Plaintiff also alleges that the label was

misleading because Defendant "represented that its BPO Products were of merchantable quality,

safe to use as prescribed, complied with federal and state law, and did not contain carcinogens or

other impurities such as benzene." *Id.* ¶ 62; *see also id.* ¶ 8 (alleging that plaintiff read the product's

"accompanying labels and disclosures and understood them as representations and

warranties . . . that the BPO Product was properly manufactured, free from defects, safe for its

intended use, and not adulterated or misbranded."). According to Plaintiff, these implied—and

---

[3] This case is one of many lawsuits filed around the country that challenge the FDA's approval of benzoyl peroxide in acne products. The Court observes that this Complaint erroneously states that "[a]ll claims alleged herein arise out of violations of Missouri and Florida law." Compl. ¶ 2. Because the remainder of the Complaint is premised on New York causes of action, the Court understands this assertion to be a mistake.

unidentified—"representations" were false because "the benzoyl peroxide could produce benzene and/or degraded to form benzene." *Id.* ¶ 107.

Plaintiff's fraud claim is similarly premised on the allegation that Defendant concealed that the product contains benzene "and/or" could degrade to form benzene. *See* Compl. ¶ 121 (alleging that Defendant "intentionally and knowingly falsely concealed, suppressed and/or omitted material facts including as to the standard, quality or grade of the BPO Product."); *id.* ¶ 124 ("Defendant knew or should have known that its BPO Products contain benzene and/or degrade into benzene when used as directed.")

Plaintiff's negligence *per se* claim, based on Defendant's alleged violation of New York Education Law §§ 6811(9)–(11) is premised on two alternative theories. The first mirrors Plaintiff's Section 350 and fraud claims in that it is rooted in the contention that the BPO Product's label was misleading. New York Education Law §§ 6811(9)–(11) bans anyone from manufacturing or selling drugs that are "misbranded," meaning that the drug's "labeling is false or misleading in any particular . . . ." *See* N.Y. Educ. L. §§ 6811(9)-(11); N.Y. Educ. Law § 6815(2)(a). According to Plaintiff, the label was false or misleading because of the Benzene Omissions.

Plaintiff's second negligence *per se* theory is based not on the labeling of the BPO Product but on the product itself. Under the Education Law, a drug is "misbranded" not only if its labeling is false or misleading, but also if the drug is "dangerous to health when used in the dosage, or with the frequency or duration prescribed, recommended or suggested in the labeling thereof." N.Y. Educ. Law § 6815(2)(i). Additionally, the New York Education Law bans the sale of "adulterated" drugs. *See* N.Y. Educ. L. §§ 6811(9)-(11). A drug is "adulterated" under the state statute "[i]f it consists in whole or in part of any filthy, putrid, or decomposed substance; or if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health . . . ." N.Y. Educ. Law §

7

6815(1)(a).  Plaintiff's second negligence *per se* theory is that the product is both "misbranded" and "adulterated" under the Education Law because the benzoyl peroxide in the product degraded to form more than 2 ppm of benzene; therefore, Plaintiff contends, the product is dangerous to health even when used as suggested in the labeling.  Compl. ¶¶ 8, 17, 52, 139 ("Defendant violated New York state law because it manufactured and sold adulterated and misbranded Products that contain benzene and/or degrade to form benzene . . . as alleged, the levels of benzene detected in the Products render the Products dangerous to health when used as prescribed and illegal to sell under New York state law.").

In terms of his injuries, Plaintiff alleges that "[n]ot only would Plaintiff not have purchased Defendant's BPO Product had he known the product contained benzene and/or would degrade to form benzene, he would not have been capable of purchasing it if Defendant had done as the law required and tested the BPO Product for benzene and other carcinogens and impurities."  *Id.* ¶¶ 84; *see also* 116 ("Had Defendant not engaged in the deceptive acts and practices alleged herein, Plaintiff and Class members would not have purchased the BPO Products at all, or would have paid less for them . . . .").  Plaintiff, along with putative class members, "bargained for products free of contaminants and dangerous substances" and were "injured by the full purchase price of the BPO Product because the Product is worthless, as it is adulterated, contains harmful levels of benzene, and [is] illegal to sell, and Defendant failed to warn consumers of this fact."  *Id.* ¶ 88.  In sum, Defendant allegedly "illegally sold products are worthless and have no value."  *Id.*

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on August 16, 2024.  Dkt. No. 1.  Defendant filed a motion to dismiss on January 17, 2025.  Dkt. No. 37; Dkt. No. 38 ("Mem."); Dkt. No. 39 (request for judicial notice); Dkt. Nos. 40, 41.  Plaintiff opposed the motion on February 7, 2025.  Dkt. No. 42 ("Opp.").  Defendant replied on February 14, 2025.  Dkt. No. 43 ("Reply").  Defendant also filed

notices of two supplemental authorities in support of its motion on May 2, 2025.  Dkt. Nos. 46, 49.

### III.     LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion to dismiss under Rule 12(b)(6), the Court "constru[es] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)).

"To survive a 12(b) motion, a plaintiff must allege facts that, accepted as true, make out the elements of a claim."  *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 308 (S.D.N.Y. 2001).  Failure to adequately allege "an essential element" of a claim is grounds for dismissal under Rule 12(b)(6).  *Schneider v. Pearson Educ., Inc.*, No. 12 CIV. 6392 JPO, 2013 WL 1386968, at *5 n.6 (S.D.N.Y. Apr. 5, 2013) (internal quotation marks and citations omitted).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint."  *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006).  But a court may consider "any 'written instrument' that is attached to [the complaint] as 'an exhibit,'" "incorporated in it by reference," or "integral to the complaint."  *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir.

2020) (quoting Fed. R. Civ. P. 10(c) (other citations omitted)).  A pleading incorporates a document

by reference where it makes "a clear, definite and substantial reference to the document[]."  *Madu,*

*Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010) (quoting

*Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003)).

A court may also consider "matters of which judicial notice may be taken."  *Goel v. Bunge,*

*Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  Federal Rule of Evidence 201(b) permits a court to take

judicial notice of facts that are "not subject to reasonable dispute" because they (1) are "generally

known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily

determined from sources whose accuracy cannot reasonably be questioned."[4]

Additionally, Defendant in this case argues that Plaintiff's claims are preempted.

"[P]reemption is 'an affirmative defense.'"  *Glover v. Bausch & Lomb Inc.*, 6 F.4th 229, 236 (2d Cir.

2021) (citing *Ricci v. Teamsters Union Loc. 456*, 781 F.3d 25, 28 (2d Cir. 2015)).  "An affirmative

defense is defined as a defendant's assertion raising new facts and arguments that, if true, will defeat

the plaintiff's . . . claim, even if all allegations in the complaint are true."  *Saks v. Franklin Covey Co.*,

316 F.3d 337, 350 (2d Cir. 2003).  "[A]n affirmative defense is traditionally one that a defendant

would have the burden not only of pleading but also of proving."  *Walker v. Schult*, 45 F.4th 598, 616

(2d Cir. 2022).  "Dismissal under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the

face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's

claims are barred as a matter of law.'"  *Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 150

(2d Cir. 2024) (quoting *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015)).

---

[4] In particular, the Court considers the Valisure Citizen Petition on Benzene in Benzoyl Peroxide Drug Products because it is incorporated by reference in the Complaint.  *See* Comp. ¶¶ 18, 37–43.  Defendant also requested the Court to take judicial notice of the petition.  Dkt. No. 41-4 (the "Citizen Petition").  Plaintiff does not object and relies on the Citizen Petition throughout its opposition.  *See* Opp. at 15.  In any event, "courts routinely take judicial notice of . . . documents which are publicly available on the FDA's website."  *Simeone v. T. Marzetti Co.*, 2023 WL 2665444, at *1 (S.D.N.Y. Mar. 28, 2023); *see also, Dains v. Bayer HealthCare LLC*, 2022 WL 16572021, at *7 (N.D.N.Y. Nov. 1, 2022) (taking judicial notice of citizen petition to the FDA available on http://regulations.gov).

## IV.    DISCUSSION

### A.    Federal Law Expressly Preempts Plaintiff's Claims Insofar as Plaintiff Contends that the BPO Product's Label is Misleading Because it Allegedly Fails to Include the Benzene Omissions, or Because the BPO Product Otherwise Contains or Degrades into Benzene

Because the FDCA does not require Defendant to disclose that its acne wash contains or can degrade to form benzene, Plaintiff's Section 350, fraud, and negligence *per se* claims based on those allegedly omitted warnings are preempted.  Plaintiff's negligence *per se* claim is also preempted because, as pleaded, the sale of Defendant's OTC acne treatment—which is made with the FDA approved active ingredient benzoyl peroxide—does not violate the FDCA even if the product contains traces of benzene after its sale.  The Court begins with an overview of the relevant regulatory landscape under the FDCA before turning to Plaintiff's claims.

### 1.    The Federal Regulatory Scheme Governing OTC Drugs

"The federal government regulates the manufacture, labeling, and sale of pharmaceuticals pursuant to the FDCA."  *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 707 (2d Cir. 2019).  The FDCA is "part of a comprehensive federal regulatory scheme to protect consumers from fraud or misrepresentation in the sale of food, drugs, and cosmetics."  *Critcher v. L'Oreal USA, Inc.*, 2019 WL 3066394, at *2 (S.D.N.Y. July 11, 2019), *aff'd*, 959 F.3d 31 (2d Cir. 2020).  In passing the FDCA, "Congress intended to create a national and uniform regulatory scheme, . . . which up until the FDCA's passage, had been subject to the disparate laws of the states."  *Patora v. Vi-Jon, LLC*, 2023 WL 5610300, at *3 (S.D.N.Y. Aug. 30, 2023).

In general, "a new drug may not enter interstate commerce unless [the] FDA determines that it is generally recognized as safe and effective ('GRAS/E') for the particular use described in its product labeling."  *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 75 (2d Cir. 2013), *as amended* (Mar. 21, 2013).  "The FDA's premarket approval of a new drug application includes the approval of the exact text in the proposed label."  *Gibbons*, 919 F.3d at 707 (citing *Wyeth*

*v. Levine*, 555 U.S. 555, 568 (2009)).

"While [the] FDA must generally approve drugs as GRAS/E individually, the monograph system allows manufacturers to bypass individualized review." *Nat. Res. Def. Council, Inc.*, 710 F.3d at 75. "Under this system, FDA issues a detailed regulation—a 'monograph'—for each therapeutic class of OTC drug products." *Id.* "Like a recipe, each monograph sets out the FDA-approved active ingredients for a given therapeutic class of OTC drugs and provides the conditions under which each active ingredient is GRAS/E." *Id.* The "FDA excludes from its monographs any active ingredients or uses of active ingredients that it has determined either not to be GRAS/E or for which there is insufficient data to confirm whether they are GRAS/E." *Id.* "The FDA determines the GRAS/E status of each OTC drug product and issues monographs for each category." *Id.*

As part of the monograph system, the FDCA sets forth a list of requirements necessary for any OTC drug to be considered GRAS/E and "not misbranded." *See* 21 C.F.R. § 333.301 (titled "[g]eneral conditions for general recognition as safe, effective and not misbranded"). One of those conditions is that "[t]he product is manufactured in compliance with current good manufacturing practices[.]" *Id.* § 330.1(a). The current good manufacturing practices ("cGMPs") are "standards" that are "designed to insure [sic] the production of unadulterated drugs." *Nutritional Health All. v. Food & Drug Admin.*, 318 F.3d 92, 100 (2d Cir. 2003) (quoting *United States v. An Article of Drug*, 484 F.2d 748, 751 (7th Cir. 1973)).

The FDA has also promulgated regulations that apply only to OTC topical acne drug products, and others still that apply only if the acne drug contains benzoyl peroxide. *See* 21 C.F.R. §§ 333.301–333.350 (the "Acne Monograph"); *see also Patora*, 2023 WL 5610300, at *3 (discussing the FDA's regulations of OTC topical acne drug products).[5] The Acne Monograph provides that a

---

[5] "The FDCA defines drugs, in part, as 'articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals' and 'articles (other than food) intended to affect the structure or function of the body of man . . . .'" *Booker v. E.T. Browne Drug Co.,* 2021 WL 4340489, at *4 (S.D.N.Y. Sept. 23, 2021) (citing

topical, OTC drug product "is generally recognized as safe and effective and is not misbranded if it meets" (1) "each of the conditions" that apply only to topical acne drug products and (2) "each general condition" applicable to all OTC drugs to be "generally recognized as safe and effective and is not misbranded." 21 C.F.R. § 333.301.

With respect to the Acne Monograph's specific conditions, it expressly permits benzoyl peroxide to be used as an active ingredient in a concentration of 2.5 to 10 percent. *Id.* § 333.310(a). Additionally, the monograph provides specific labeling requirements for such products. *Id.* § 333.350; *see generally Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31, 35 (2d Cir. 2020) (explaining in the context of the cosmetics monograph, that applicable products "must follow particular labeling protocols[.]"). Included in the labeling requirements are "exact warnings that must be on the labels of OTC acne drug products, including warnings that are only necessary for the subset containing [benzoyl peroxide]." *Howard v. Alchemee, LLC*, 2024 WL 4272931, at *8 (C.D. Cal. Sept. 19, 2024) (citing 21 C.F.R. §§ 333.350(c)(4), (d)(2)). A particular OTC acne drug product that "meets each of the conditions" of the Acne Monograph and each of the general conditions required for all OTC drugs—including the cGMPs—is "generally recognized as safe and effective and is not misbranded." *See* 21 C.F.R. § 333.301; 21 C.F.R. § 330.1.

While the FDCA permits the sale of drugs that meet each of the applicable conditions, by the same token, the FDCA prohibits "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded." *See* 21 U.S.C. § 331. Under the FDCA, a drug is adulterated if:

> (1) If it consists in whole or in part of any filthy, putrid, or decomposed substance; or (2)
>
> > (A) if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health; or

---

21 U.S.C. §§ 321(g)(1)(B), (C)); *see also* 21 C.F.R. § 333.303 (defining "acne" as a "disease"). It is not contested that Defendant's BPO product is a drug under the FDCA.

> (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding *do not conform to or are not operated or administered in conformity with current good manufacturing practice* to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess . . . .

21 U.S.C. § 351 (emphasis added).  A drug is "misbranded" if "its labeling is false or misleading in any particular," *id.* § 352(a), or "[i]f it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof," *id.* § 352(j).[6]

## 2.  Preemption Under the FTCA

Given that a "comprehensive federal regulatory scheme" exists "to protect consumers from fraud or misrepresentation," *Critcher*, 2019 WL 3066394, at *2, and to "create a national and uniform regulatory scheme," it is unsurprising that the FDCA contains "an express preemption provision for conflicting state laws governing OTC drugs," *Patora*, 2023 WL 5610300, at *3.  The FDCA states: "[N]o State or political subdivision of a State may establish or continue in effect any requirement (1) that relates to the regulation of a drug . . . and (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter."  21 U.S.C. § 379r(a) ("Section 379r(a)"); *see generally Critcher*, 959 F.3d at 35 (discussing a parallel preemption clause for cosmetics and stating "to ensure that . . . various federal requirements are not obstructed by state law . . . Congress added to the FDCA an expansive preemption provision").[7]  "In other words, the FDCA preempts not only those state laws that are in conflict with it (i.e., any law that is 'different from' the FDCA), but also any state law that provides for . . . requirements that are not exactly the

---

[6] But, as described above, an OTC topical acne drug product is expressly "not misbranded" if it complies with the applicable monograph and "each general condition" applicable to the sale of OTC drugs, *Howard*, 2024 WL 4272931, at *6, including that "[t]he product is manufactured in compliance with current good manufacturing practices, 21 C.F.R. § 330.1(a).

[7] Plaintiff does not argue that its claims fall within § 379r's "savings clause," which "exempts from the express preemption 'any action or the liability of any person under the product liability law of any State.'"  *See In re Oral Phenylephrine Mktg. & Sales Pracs. Litig.*, 755 F. Supp. 3d 208, 212 (E.D.N.Y. 2024) (citing 21 U.S.C. § 379r(e)).

14

same as those set forth in the FDCA and its regulations (i.e., any law that is 'in addition to' the FDCA)." *Critcher*, 959 F.3d at 35–36; *see also Collaza v. Johnson & Johnson Consumer Inc.*, 2025 WL 2233746, at *2 (2d Cir. Aug. 6, 2025) (applying *Critcher* to Section 379r, noting that "[w]e have emphasized, when analyzing near-identical language in an FDCA preemption provision for cosmetic drugs, that 'the FDCA preempts not only those state laws that are in conflict with it (*i.e.*, any law that is 'different from' the FDCA), but also *any* state law that provides for [ ] requirements that are not *exactly the same* as those set forth in the FDCA and its regulations (*i.e.*, any law that is 'in addition to' the FDCA).'") (summary order) (brackets in original).[8]

In addition to express preemption, state law claims can be "impliedly preempted" by the FDCA. *See Glover*, 6 F.4th at 237 (citing *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 121 (2001)). "The FDCA provides that 'all . . . proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States.'" *Id.* (citing 21 U.S.C. § 337(a)). "[T]he Supreme Court held [in *Buckman Co.*] that because Congress intended that the FDCA be enforced exclusively by the Federal Government, *see* 21 U.S.C. § 337(a), claims seeking to enforce FDCA regulations, or claims where the violation of FDCA regulations were a 'critical element' of the case were impliedly pre-empted." *Elkind v. Revlon Consumer Prods. Corp.*, 2015 WL 2344134, at *6 (E.D.N.Y. May 14, 2015) (citing *Buckman Co.*, 531 U.S. at 352–53 (discussing preemption in the medical device context)). "To withstand this strain of FDCA preemption, therefore, claims must be based not on the FDCA, but on traditional state tort law which . . . predate[s] the federal enactments in question, or other state remedies that are parallel to, but not

---

[8] As recognized in *Collaza*, the preemption clause for cosmetics, which was at issue in *Critcher*, parallels the preemption clause for OTC topical acne drug products. The preemption provision for cosmetics states: "[N]o State or political subdivision of a State may establish or continue in effect any requirement for labeling or packaging of a cosmetic that is different from or in addition to, or that is otherwise not identical with, a requirement specifically applicable to a particular cosmetic or class of cosmetics under this chapter." 21 U.S.C. § 379s(a). Therefore, although *Critcher* discussed preemption in the cosmetics context, its reasoning applies equally to the sale of OTC topical acne drug products.

premised on, the FDCA." *In re Chantix (Varenicline) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*,
735 F. Supp. 3d 352, 379 (S.D.N.Y. 2024) (citing *Glover*, 6 F.4th at 237) (internal quotation marks
omitted).

      "Together, express and implied preemption under the FDCA, 'operating in tandem, have
created what some federal courts have described as a "narrow gap" for pleadings.'" *Glover*, 6 F.4th
at 237 (explaining that "[t]he plaintiff must be suing for conduct that violates the FDCA (or else his
claim is expressly preempted by [the express preemption clause applicable to medical devices], but
the plaintiff must not be suing because the conduct violates the FDCA (such a claim would be
impliedly preempted under *Buckman*).") (quoting *In re Medtronic, Inc.*, 623 F.3d 1200, 1204 (8th Cir.
2010));[9] *see also In re Chantix (Varenicline) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 735 F. Supp.
3d at 379 ("[I]f a plaintiff's 'true goal is to privately enforce alleged violations of the FDCA,' she
cannot bring a cause of action under state law.") (quoting *PDK Labs, Inc.* v. *Friedlander*, 103 F.3d
1105, 1113 (2d Cir. 1997)).  "Given the FDCA's language, Plaintiffs must thread a very narrow
needle to avoid preemption:  the conduct underlying the claim *must violate* the FDCA, but the claim
itself cannot exist *because* the conduct constitutes a violation of the FDCA."  *Booker*, 2021 WL
4340489, at *6 (emphasis in original) (citing *Glover*, 6 F 4th at 237); *see also Elkind*, 2015 WL 2344134,

---

[9] *Glover* discussed the express preemption clause that governs medical devices, 21 U.S.C. § 360k.  That provision parallels
the Section 379r, the express preemption clause that applies to OTC drugs.  The medical device preemption provision
states:
      [N]o State or political subdivision of a State may establish or continue in effect with respect to a device
      intended for human use *any requirement--*
            (1) *which is different from, or in addition to, any requirement applicable under this chapter to the device*, and
            (2) which relates to the safety or effectiveness of the device or to any other matter included in a
            requirement applicable to the device under this chapter.
21 U.S.C. § 360k.  The OTC drug preemption provision states:
      [N]o State or political subdivision of a State may establish or continue in effect *any requirement--*
            (1) that relates to the regulation of a drug that is not subject to the requirements of section 353(b)(1)
            or 353(f)(1)(A) of this title; and
            (2) *that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter,* the
            Poison Prevention Packaging Act of 1970 (15 U.S.C. 1471 et seq.), or the Fair Packaging and Labeling
            Act (15 U.S.C. 1451 et seq.).
21 U.S.C. § 379r.

at *6 (noting that state law claims must proceed through "a narrow gap" to avoid preemption under the FDCA).

### 3. Each of Plaintiff's Claims Premised on the Alleged Benzene Omissions Are Preempted

The FDCA preempts Plaintiff's claims premised on the Benzene Omissions—that Defendant allegedly failed to disclose that the BPO Product contains benzene "and/or" may degrade to form benzene—because the Acne Monograph does not require those warnings. The FDCA's express preemption clause applicable to nonprescription drugs prevents a state from establishing any "requirement" "that relates to the regulation of a drug" and "that is different from or in addition to, or that is otherwise not identical with, a requirement" under the FDCA. *See* Section 379r(a).[10] A "requirement" includes "any requirement relating to public information or any other form of public communication relating to a warning of any kind for a drug." *Id.* § 379r(c)(2). "[T]he term 'requirements' . . . reaches beyond positive enactments, such as statutes and regulations, to embrace common law duties." *Patora, LLC*, 2023 WL 5610300, at *4 (citing *Bates v. Dow Agroscis. LLC*, 544 U.S. 431, 443 (2005)). "A common law rule that 'requires that manufacturers label or package their products in [a] particular way' qualifies as a requirement with respect to labeling." *Id.* "A state law that applies to drugs is preempted if it imposes a requirement that is not identical to the requirements of the FDCA and the FDA's regulations." *Id.* Consequently, the question before the Court is whether Plaintiff's claims based on Defendant's alleged failure to disclose that the BPO Product contains "and/or" can degrade to form benzene imposes a "requirement" for the OTC acne product that is "different from" or "in addition to," or is "otherwise not identical" with those

---

[10] Section 349r(a) applies to non-prescription drugs. Defendant expressly argues that Section 349r(a) applies to the BPO Product. Plaintiff does not contest, and therefore concedes, that Section 379(r) applies. *See* Opp. at 4; *see Curry Mgmt. Corp. v. JPMorgan Chase Bank, N.A.*, 643 F. Supp. 3d 421, 426 (S.D.N.Y. 2022) (explaining that "a party may be deemed to concede an argument by failing to address it in an opposition brief.").

of the Acne Monograph.  The Court concludes that they do.

At the outset, as pleaded, the Acne Monograph does not require Defendant to disclose that the BPO Product "contains benzene" because the Complaint does not allege that Defendant intentionally used benzene in its products.  "The FDA mandates disclosure of the active and inactive ingredients on the label."  *Howard, LLC*, 2024 WL 4272931, at *8 (citing 21 C.F.R. § 201.66, 333.310).  An active ingredient is "any component that is *intended* to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans."  21 C.F.R. § 201.66(b)(2) (emphasis added).  "The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form *intended to* furnish the specified activity or effect."  *Id.* (emphasis added).  "Inactive ingredient means any component other than an active ingredient."  *Id.* § 201.66(b)(8).  A "component" is "any ingredient *intended for use* in the manufacture of a drug product."  *Id.* § 210.3 (emphasis added); *see generally Navarro v. Walgreens Boots All., Inc.*, 2025 WL 1411406, at *13 (discussing the definition of the term "component").

Here, the benzene Plaintiff allegedly found in Defendant's BPO Product does not fit the definition of an active or inactive ingredient that needs to be disclosed on its label.[11]  Plaintiff does not allege that benzene was a component intended to contribute to the treatment of acne such that it was an active ingredient, 21 C.F.R. § 201.66, nor does Plaintiff allege that benzene was an inactive ingredient that Defendant "intended for use" in its manufacturing.  *See* 21 C.F.R. § 210.  Rather, Plaintiff expressly alleges that Defendant's "BPO Products *are not designed to contain benzene.*"  Compl. ¶ 45 (emphasis added).  Instead, the very thrust of Plaintiff's theory is that benzoyl peroxide

---

[11] Plaintiff did not respond to Defendant's argument that benzene was neither an active nor an inactive ingredient that needed to be listed on the BPO Product's label.  Plaintiff therefore concedes the point.

"systemically degrade[s]" to form benzene.  *See* Compl. ¶ 17 ("Collectively, all lots of Defendant's

BPO Products contain and/or or [sic] systematically degrade to form benzene"); *see also* Opp. at 5

(arguing that the supplemental warning that Defendant should have included on its label was a

disclaimer "informing consumers that *benzoyl peroxide can degrade* to form benzene.") (emphasis

added).

Therefore, as pleaded, "benzene does not fit the definition of any type of ingredient" that

Defendant needed to disclose because "it is not a purposefully added component of the drug."  *See*

*Howard*, 2024 WL 4272931, at *8 (internal citations omitted); *Navarro,* 2025 WL 1411406, at *13

(same); *see also Truss v. Bayer Healthcare Pharms. Inc.*, 2022 WL 16951538, at *4 (S.D.N.Y. Nov. 15,

2022) (byproduct of active ingredient's degradation is neither an active nor inactive ingredient and

need not be disclosed as an ingredient under the FDCA); *see generally Barnes v. Unilever U.S. Inc.*, 2023

WL 2456385, at *9 (N.D. Ill. Mar. 11, 2023) ("The FDA's regulations permit the exclusion of

unintended ingredients from the product's label[").

Additionally, the Acne Monograph does not require a warning that benzoyl peroxide may

degrade into benzene.  As described above, "the FDA has specifically identified the warnings that

must be provided when an acne drug contains [benzoyl peroxide]."  *Howard*, 2024 WL 4272931, at

*8 (citing 21 C.F.R. § 333.350(c)(4), (d)(2)).  The Acne Monograph expressly permits products to

contain benzoyl peroxide but it "do[es] not include any mention of benzene or its risks," including

that benzoyl peroxide may inherently degrade to form benzene.  *Id.*

Plaintiff argues that Defendant could have supplemented its label beyond what the FDA

requires, Opp. at 4, but the FDA's promulgation of specific labeling requirements for OTC acne

products—when read in connection with Section 379r(a)'s express preemption clause—forecloses

the imposition of such a requirement.  *See Daugherty, et al., Plaintiffs, V. Padagis Us Llc, et al.,*

*Defendants.*, 2025 WL 2243622, at *7 (N.D. Cal. Aug. 6, 2025) (noting that "[m]any courts which have

addressed the issue have held that Section 379r(a) preempts consumer claims seeking to mandate

under state law disclosure of benzene or its risks" and collecting cases);[12] *see generally In re Oral*

*Phenylephrine Mktg. & Sales Pracs. Litig.*, 755 F. Supp. 3d 208, 212 (E.D.N.Y. 2024) ("An express

preemption clause often preempts state law that extends beyond federal law in any respect, meaning

that federal law acts as a floor and a ceiling for state requirements.") (citing *Riegel v. Medtronic*, 552

U.S. 312, 316 (2008)).

    The Second Circuit's reasoning in *Critcher* explains why.  In *Critcher*, a plaintiff argued that a

cosmetic product's label was misleading notwithstanding its compliance with the FDA's labeling

requirements because the product failed to include supplemental information, namely, that not all of

the product fully dispensed from the tube.  The Second Circuit explained:

> [T]he FDA has promulgated rules regulating what must be included on labels.  The
> regulations have therefore stated, with specificity, what information is necessary to avoid
> misleading consumers . . . .  In light of the technical nature of such [labeling] requirements—
> combined with Congress's broad, categorical statement of preemption in the FDCA—we are
> reluctant to conclude that states may impose *other* labeling requirements that have not been
> imposed by Congress or the FDA.  If we were to impose such *additional* labeling
> requirements, we would be construing state law to impose many "requirements" that are not
> contained in the federal statute, or in the regulations issued thereunder, and to disrupt what
> Congress intended to be a uniform—and federally-led—regulatory scheme.

*Critcher*, 959 F.3d at 34, 38 (rejecting claims brought under N.Y Gen. Bus. Law §§ 349–50 alleging

that a required net-weight labeling was preempted based on the failure to add a supplemental

---

[12] *See, e.g., Howard, LLC*, 2024 WL 4272931, at *10 ("Plaintiffs seek to require Defendants to make disclosures not required under the FDCA that would conflict with the FDA's conclusion that BPO is safe and effective. Because Plaintiffs' claims would impose requirements that differ from and are in addition to those in the FDCA, they are preempted under § 379r."); *Williams v. Galderma Lab'ys, L.P.*, 2024 WL 4213220, at *3 (N.D. Ill. Sept. 17, 2024) (same); *Smoter v. Mentholatum Co., Inc.*, 2025 WL 273437, at *2 (N.D. Ill. Jan. 17, 2025) ("[T]o the extent the plaintiffs argue the labels of the OXY products should have warned them of the possibility of benzene or included benzene as an ingredient, these claims are preempted by federal law and must fail."); *Bodunde v. Walgreens Boots All., Inc.*, 2025 WL 1411306, at *12 (E.D. Cal. May 15, 2025) ("[T]o the extent Plaintiff's claims are based on allegations that Walgreens should have warned about the presence of benzene on Walgreen's BPO product labels, that theory is expressly preempted because it would be an addition not required by federal law."); *Eisman v. Johnson & Johnson Consumer, Inc.*, 2025 WL 241024, at *4 (C.D. Cal. Jan. 17, 2025) ("Whether Eisman's theory of liability is that the presence of benzene requires a disclosure that Defendants omit, or that it renders the Products adulterated and misbranded, each of his claims seeks to impose requirements that [are] 'different from or in addition to, or that are otherwise not identical with the FDA's.'") (brackets in original).

disclaimer that not all of the product could be dispensed from the packaging) (emphasis in original).[13]

Here, as in *Critcher,* the FDA has promulgated rules regulating the content of labels of OTC acne products made with benzoyl peroxide. Because the FDA's regulations have already "stated, with specificity, what information is necessary to avoid misleading consumers," *Critcher*, 959 F. at 38, Plaintiff's claims based on the alleged omission of a warning that was not required by the FDCA and the FDA are expressly preempted. If Plaintiff were permitted to move forward with his claims premised on the omission of a disclosure that benzoyl peroxide may degrade into benzene, he would be using state law to impose labeling requirements "that are *not contained* in the federal statute, or in the regulations issued thereunder." *See id.* (emphasis added). "These would be requirements 'different from' or 'in addition to'—or otherwise 'not identical with'—those requirements that federal law already imposes," which is "exactly what the FDCA does not permit." *Id.* at 36.

The cases relied on by Plaintiff in support of his contention that the federal law permits the addition of a supplemental warning that benzoyl peroxide can degrade into benzene are inapposite. Plaintiff first relies on *Clinger v. Edgewell Personal Care Brands, LLC*, 2023 WL 2477499, at *10 (D. Conn. March 13, 2023) for the proposition that Defendant could have added supplemental warnings "informing consumers that benzoyl peroxide can degrade to form benzene." Opp. at 5. "In *Clinger v. Edgewell Personal Care Brands, LLC*, the district court—after accepting the truth of the disputed allegation that benzene *is an intended ingredient* of sunscreen—found that the FDA's required warnings for OTC drugs did not preempt claims that other warnings about the risks of benzene in sunscreen were required." *Howard*, 2024 WL 4272931, at *8 (discussing and distinguishing *Clinger*)

---

[13] As noted previously, the preemption clause applicable to the cosmetics products in *Critcher*—21 U.S.C. 379s—is, to use Plaintiff's own words, "virtually identical to the preemption language in 379r," Opp. at 8 n.1, because both prohibit any state from establishing any requirement that is different from or in addition to, or that is otherwise not identical with federal law. *See* Section 379r (over-the-counter drugs); 21. U.S.C. § 379s (cosmetic products). *Critcher's* logic therefore applies equally in this case.

(emphasis added).  But "[t]he regulations at issue in *Clinger*" related to the sunscreen monographs, which "did not approve the use of, or mandate warnings about, an ingredient in sunscreen that was the alleged source of the benzene."  *Id.* (concluding that a plaintiff could not use state law to benzene warnings that allegedly resulted as an unintended byproduct of benzoyl peroxide in an OTC acne medication).

Here, the Acne Monograph expressly specified the required warnings for acne products made with benzoyl peroxide—the alleged source of the benzene contamination—and a warning that it may degrade to form benzene was not one of them.  *Cf. Critcher*, 959 F.3d at 36–37 ("Congress or the FDA could have chosen to mandate such additional labeling when they established the comprehensive regulatory regime governing cosmetics, but they did not. And because of the broad preemption provision that Congress *did* choose to include, Plaintiffs cannot now seek to impose those requirements through alternative means grounded in state law.").

Additionally, Plaintiff argues that supplemental warnings about the risk of benzoyl peroxide degrading into benzene are permitted because, in *In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*, 2022 WL 17348351, at *7 (S.D. N.Y. Nov. 14, 2022), the court concluded that a manufacturer of an OTC pain reliever could add supplemental warnings about the consumption of the drug by pregnant women.  But *In re Acetaminophen* is distinguishable, too.  There, express preemption was not at issue because Section 379r's "savings clause," which exempts from the express preemption "any action or the liability of any person under the product liability law of any State" applied.  The defendants in that case only argued—and the court only applied—a conflict preemption analysis that was not bound by Section 379r(a)'s express preemption limitation.  *See id.* at *6–9 (explaining that the defendant relied on conflict preemption, which is a particularly "demanding defense" and different than express preemption).

Without the limitation imposed by express preemption and relying on the demanding

standard of conflict preemption, the court concluded the lack of language in the OTC drug regulation "suggest[ing] that the requirements in the monograph are exclusive of any other warnings that a manufacturer may add to the label," meant that a manufacturer could add supplemental warnings about certain uses necessary to comply with state tort law.  *Id.*; *see also In re Oral Phenylephrine Mktg. & Sales Pracs. Litig.*, 755 F. Supp. 3d at 216 ("By excepting state product-liability law from express preemption in § 379r(e), Congress allowed states to layer additional state protections atop federal ones, but only when those protections relate to safety[.]").  Because express preemption applies here, *In re Acetaminophen* is not on point.  *See Collaza*, 2025 WL 2233746, at *4 (affirming the district court's determination that a plaintiff's claims that sought to add disclaimers to an acetaminophen-based product "were preempted under Section 379r(a) because, if [plaintiff] were to prevail on such claims, it would impose additional labeling requirements beyond those required by the FDA").

Finally, Plaintiff argues that its claims based on the Benzene Omissions are not preempted because "the disclosure of a benzene warning may even be 'required' under the FDA's changes-being-effected ('CBE') regulations," Opp. at 5, but this argument fails too.  "Under the [new drug approval] process, premarket approval of the new drug includes approval of the exact text of a proposed label.  A regulatory path to change the label—the CBE regulation—is therefore necessary."  *In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 2022 WL 17348351, at *10 (internal citations omitted).  "In contrast, drugs sold under the monograph system do not need FDA approval of their labels at any point."  *Id.*  Plaintiff has not established that the changes-being-effected regulations apply to this case, one involving a concededly non-prescription drug sold pursuant to the monograph.[14]  By seeking to hold Defendant liable for a misleading label based on

---

[14] Even if the CBE regulations did apply, Plaintiff has not met its burden of establishing that Defendant "could have corrected" its BPO Product's labels "using the CBE regulation" because it has not alleged that that risks associated with benzene or the fact that benzoyl peroxide may degrade to form benzene constituted "newly acquired information"

the failure to list information not required by federal law, Plaintiff's Section 350, fraud, and negligence *per se* claims based on the BPO Product's allegedly misleading label would each be imposing labeling requirement not required by the FDCA in violation of the FDCA's express preemption provision.

### 4. Plaintiff's Negligence *Per Se* Claim Based on the Alleged Presence of Benzene in the BPO Product is Preempted

Plaintiff's negligence *per se* claim is preempted because federal law does not prohibit the sale of Defendant's BPO Product under the circumstances pleaded here. As already explained, a state law claim that imposes a "requirement" "that relates to the regulation of a drug" and "that is different from or in addition to, or that is otherwise not identical with, a requirement" under the FDCA is preempted. *See* Section 379r(a). At the same time, "[n]othing in [Section 379r] shall prevent a State . . . from enforcing, under any relevant civil or other enforcement authority, a requirement that is identical to a requirement of this chapter." *See* 21 U.S.C. § 379r(f). Here, as pleaded, Plaintiff's claim of *per se* negligence would impose a requirement that is not identical to that imposed by federal law, namely, a ban on the sale of acne products made with benzoyl peroxide that

---

within the meaning of the CBE regulations, as is required to state a failure to warn claim under the CBE regulations. *Cf. Gibbons*, 919 F.3d at 707. Here, Plaintiff alleges that "[t]he health hazards of benzene have been recognized for over one hundred years" and cites several reports and studies to that effect. *See e.g.,* Compl. ¶¶ 21–27 (citing sources ranging from the National Cancer Institute to the National Toxicology Program to a study by the International Agency for Research Center conducted in 1974 demonstrating the risks of benzene). Plaintiff also alleges that it is "well known that [benzoyl peroxide] degrades to form benzene when exposed to heat over time." *Id.* ¶ 63. If anything, therefore, Plaintiff alleges that the FDA is and has been aware of the hazards associated with benzene. *Id.* ¶ 28 (noting that FDA already "recognizes that '[b]enzene is a carcinogen that can cause cancer in humans'"); *id.* ¶ 71 (noting that the FDA in publishing the final monograph on benzoyl peroxide summarized "results from further studies on the potential carcinogenicity of benzoyl peroxide and actions of the FDA Advisory Committee," and expressly noted "that the word, 'cancer' should not be included in the labeling of acne drug products" because "the data were inconclusive"). While Plaintiff faults Defendant for failing to cite "any authority or regulatory history" of the FDA's consideration of the risk associated with benzene, Opp. at 10, it is Plaintiff's burden in the first instance to "plead 'a labeling deficiency that [Defendants] could have corrected using the CBE regulation.'" *Gibbons*, 919 F.3d at 707. Not only does Plaintiff's Complaint emphasize the industry's long-standing knowledge concerning risks associated with benzene—including that benzoyl peroxide may degrade—but Plaintiff's Complaint does not contain any information concerning the information included in the submissions to the FDA previously.

contain benzene.

Plaintiff's claim arises under New York Education Law §§ 6811(9)–(11). New York Education Law §§ 6811(9)–(11) make it illegal for "[a]ny person to manufacture" or sell "any drug, device or cosmetic that is adulterated or misbranded." N.Y. Educ. L. § 6811(9). The state prohibition broadly parallels the FDCA's ban on the sale of "adulterated" or "misbranded" drugs. *See* 21 U.S.C. § 331. As noted above, under the FDCA, a drug is "misbranded" "[i]f it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." *Id.* § 352(j) (emphasis added).[15] The state law mirrors this prohibition. *See* N.Y. Educ. Law § 6815(2)(i).[16]

As for adulteration, as noted previously, a drug is "adulterated" under the FDCA:

(1) If it consists in whole or in part of any filthy, putrid, or decomposed substance; or
(2)
    (A) if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health; or
    (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding *do not conform to or are not operated or administered in conformity with current good manufacturing practice* to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess . . .

21 U.S.C. § 351 (emphasis added). Similarly, a drug is "adulterated" under the state statute "[i]f it consists in whole or in part of any filthy, putrid, or decomposed substance; or if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health . . . ." N.Y. Educ. Law § 6815(1)(a).

---

[15] A drug is also misbranded if the label is false or misleading, but as already explained, Plaintiff's claims premised on the argument that the BPO Product's label was misleading for failing to include the Benzene Omissions are preempted.
[16] Under New York Education Law, a drug is "misbranded" if "its labeling is false or misleading in any particular," N.Y. Educ. Law § 6815(a), or "[i]f it is dangerous to health when used in the dosage, or with the frequency or duration prescribed, recommended or suggested in the labeling thereof," *id.* § 6815(i).

The state adulteration provision does not mention the cGMPs.

As pleaded, the BPO Product is not adulterated or misbranded under the FDCA. Before considering preemption, it is important to understand the nature of the allegations underpinning this claim. The central premise of Plaintiff's case, as explained above, is that benzoyl peroxide degrades into benzene. Plaintiff's Complaint relies heavily on the Valisure Citizen Petition, for example, which tested the "well known" fact that benzoyl peroxide "decomposes into benzene," and found that Defendant's BPO Product, among dozens of other acne medications, contained benzene. *See* Citizen Petition at 1, 8 ("[T]he specific problem with benzene in benzoyl peroxide products" is "the inherent instability of the benzoyl peroxide molecule that breaks down and forms benzene."); Compl, ¶¶ 17, 37–46 (citing the Citizen Petition in support of its contention that the BPO Product contains and/or degrades to form benzene). Based on its findings, Valisure expressly asked the FDA to "suspend sales of benzoyl peroxide from the US market[.]" *See* Citizen Petition at 1; Compl. ¶ 37 (same).

Here, Plaintiff builds on that work. He expressly alleges, based on the "testing conducted by Valisure [] of 66 acne treatment products containing benzoyl peroxide (including [Defendant's] BPO Products," that "all lots of Defendant's BPO Products contain and/or systematically degrade to form benzene." Compl. ¶ 17; *see also id.* ¶ 20 (alleging that "[t]he rates of degradation and benzene impurities in the BPO Products occur at a systematic rate."). Plaintiff also faults Defendant for knowing "that benzoyl peroxide could produce benzene and/or degrade to form benzene," *id.* ¶ 107, and still selling the product.[17] Plaintiff makes clear that the "BPO Products are not designed to contain benzene." *Id.* ¶ 45. Instead, the central tenet of Plaintiff's case is that the benzoyl

---

[17] Plaintiff also alleges that Defendant's "use of [benzoyl peroxide] put it on notice of the potential for excessive levels of benzene in its BPO Product." Compl. ¶ 74.

peroxide in all "lots" of Defendant's BPO Product systematically degrades to contain benzene.

The first problem with Plaintiff's claim as pleaded is that it is "fundamentally at odds with the FDA's monograph." *Howard*, 2024 WL 4272931, at *7. As explained above, the Acne Monograph expressly permits benzoyl peroxide to be used as an active ingredient in a concentration of 2.5 to 10 percent. C.F.R. § 333.310(a). If a particular OTC acne drug product complies with the conditions of the Acne Monograph and each of the general conditions required for all OTC drugs, it is "generally recognized as safe and effective and is not misbranded." *See* 21 C.F.R. § 333.301; 21 C.F.R. § 330.1. Notwithstanding this federal law, Plaintiff's contends that Defendant's use of benzoyl peroxide makes the product *unsafe* because it resulted benzene contamination.[18] Because here, as in *Howard*, Plaintiff's "allegations boil down to a claim that all acne drugs containing BPO are unsafe because they contain benzene, or will degrade into benzene under normal conditions, and benzene is unsafe in any amount," the claim "is, therefore, essentially an attack on the FDA's determination that OTC acne drugs containing BPO are 'generally recognized as safe and effective' and 'not misbranded' if they comply with the monograph." *See Howard*, 2024 WL 4272931, at *7. The state law claim does not, therefore, run parallel to the FDCA.[19]

The fact that the product allegedly contains greater than 2 ppm of benzene does not change the conclusion. Plaintiff alleges: "[T]he FDA issued a statement alerting manufacturers to the risk of benzene contamination and warned that any drug product containing more than 2 ppm benzene

---

[18] Plaintiff tries to plead around this by alleging in conclusory fashion that the BPO Product is not entitled to be considered GRAS/E under the federal law because Defendant violated the cGMPs and therefore does not comply with the monograph. But as explained below, Plaintiff's work-around contention that Defendant violated the cGMPs is not plausibly pleaded.

[19] Plaintiff alleges that "Defendant could have avoided any potential for benzene contamination in the BPO Products by changing the manufacturing process or raw ingredients, and the BPO Products could have been sold with absolutely no benzene in them" ostensibly because Defendant could have used a different form of benzoyl peroxide. *See* Compl. ¶ 51 (noting that "[benzoyl peroxide] is inherently stable as a pure, crystalline powder, [so] a reformulated product that focuses on substantially reducing or entirely preventing the degradation of BPO into benzene could potentially be developed."). But the FDA does not require any particular form of benzoyl peroxide; it broadly approves benzoyl peroxide as an active ingredient.

was adulterated and should be recalled. . . .  It is therefore illegal under federal law to manufacture

and distribute drug products in the United States that contain benzene above 2 ppm."

Compl. ¶¶ 48–49.  Plaintiff also alleges that because "all of Defendant's BPO Products contain

benzene above 2 ppm . . . it is illegal under New York law for Defendant to distribute any of its

BPO Products in the State of New York."  *Id.* ¶ 52.

Contrary to Plaintiff's contention, however, the FDA has not imposed a 2 ppm benzene

limit that cabins the Acne Monograph's approval of benzoyl peroxide as a safe and effective active

ingredient for use in acne products.  *See O'Dea v. RB Health (US) LLC*, 779 F. Supp. 3d 1135, 1146

(C.D. Cal. 2025) ("*O'Dea II*") (concluding that no such limit of 2 ppm exists and dismissing

plaintiff's claims on those grounds as preempted).  Rather, here, as in *O'Dea II*, Plaintiff cites only

non-binding FDA guidance that does not stand for the proposition that an acne product is

adulterated because it contains greater than 2 ppm of benzene.  779 F. Supp. 3d at 1146 (noting that

the plaintiffs failed to "identify any provision of the FDCA or any FDA regulation prohibiting

benzene in excess of 2 ppm in [benzoyl peroxide] based acne medications" despite contending that

the FDA set benzene limits on acne products made with benzoyl peroxide).

Plaintiff first cites to FDA guidance, titled "Q3C — Tables and List Guidance for Industry,"

which states that benzene, when used as a solvent, should "be avoided" in amounts above 2 ppm.

Compl. ¶ 38; *see also* Dkt. No. 41-2 (the "Q3C Guidance").[20]  The Q3C Guidance expressly states:

"This guidance represents the current thinking of [the FDA] on this topic.  It does not establish any

rights for any person and is not binding on FDA or the public."  Q3C Guidance at 1.  It also notes

---

[20] FDA "[g]uidance documents are documents prepared for FDA staff, applicants/sponsors, and the public that describe the agency's interpretation of or policy on a regulatory issue."  21 C.F.R. § 10.115(b).  FDA guidance documents must "[p]rominently display a statement of the document's nonbinding effect" and "must not include mandatory language such as 'shall,' 'must,' 'required,' or 'requirement,' unless FDA is using these words to describe a statutory or regulatory requirement."  21 C.F.R. § 10.115(i).

that the "FDA's guidance documents do not establish legally enforceable responsibilities." *Id.*

Plaintiff also cites an FDA alert regarding voluntary recalls for products containing over 2 ppm of benzene. *See* Compl. ¶ 31. That alert states: "Drug manufacturers with a risk for benzene contamination . . . *should not* release any drug product batch that contains benzene above 2 ppm . . . . If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer *should* contact FDA *to discuss* the *voluntary* initiation of a recall[.]" *Id.* (emphasis added); *see also* Dkt. No. 41-1. Neither guidance has "the force of law." *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1148 n.12 (9th Cir. 2024) (discussing these same guidance documents and noting that they do not conclusively determine what benzene levels are safe (or not) given the documents' non-binding and "caveat-laden" nature);[21] *O'Dea II*, 779 F. Supp. 3d at 1147 (concluding that these same guidance documents do "not establish a federal prohibition on the sale of Defendants' products with benzene concentrations above 2 ppm"). Absent a federal cap on the sale of acne products with over 2 ppm of benzene, as pleaded, Plaintiff's claim is expressly preempted because it imposes a requirement that is in addition to and not identical to the FDCA.

Plaintiff's backstop argument that the BPO Product is adulterated because Defendant failed to test the products in violation of the cGMPs, or that the benzene contamination "was allowed to occur because of Defendant's failure to comply with cGMPs," Opp. at 10, is not supported by the

---

[21] In *Bowen*, the court noted that the district court correctly relied on the non-binding FDA guidance "not as sources of federal law preempting Bowen's state-law claims"—because the non-binding guidance has no preemptive effect—but instead as evidence that sunscreen with benzene levels under 2 ppm was safe. *Bowen*, 118 F.4th at 1148 n.12. The court concluded, however, that the district court erred in finding that the plaintiff's claims were preempted because there was conflicting evidence that required resolution to establish Article III standing with respect to the safety of the sunscreen. *See id.* (noting that "the FDA guidance does not establish as a matter of law that sunscreen with benzene levels under 2 ppm *is safe* for human use," given the inconclusive and non-binding nature of the guidance) (emphasis added). Here, the Court is not suggesting that the non-binding guidance conclusively demonstrates that acne products with less than 2 ppm are inherently safe. Rather, the issue with Plaintiff's claim is that it contradicts the legally-binding FDA determination that *benzoyl peroxide* is a safe and effective active ingredient when used in acne products, notwithstanding its alleged potential to degrade; Plaintiff may not, therefore, use non-binding guidance to overcome the binding law. *See* C.F.R. § 333.310(a) (expressly permitting benzoyl peroxide to be used as an active ingredient in a concentration of 2.5 to 10 percent.); 21 C.F.R. § 333.301 (explaining that an OTC drug product "is generally recognized as safe and effective and is not misbranded if it meets" "each of the conditions" that apply only to topical acne drug products and "each general condition" applicable to all OTC drugs to have "general recognition as safe, effective and not misbranded.").

pleadings.  It is true that a drug is adulterated if its manufacturing practices do "not conform to or are not operated or administered in conformity with current good manufacturing practice."  *See* 21 U.S.C. § 351.  One cGMP is that "[e]ach lot of components . . . shall be withheld from use until the lot has been sampled, tested, or examined . . . .  [E]ach lot of a component, drug product container, or closure that is liable to contamination with filth, insect infestation, or other extraneous adulterant shall be examined against established specifications for such contamination."  *See* 21 C.F.R § 211.84.  Here, Plaintiff argues that the Court should "infer that Defendant violated one or more of the enumerated regulations that ultimately resulted in the distribution of a defective product to the market."  Opp. at 2.  This inference is unsupported.

First, the allegations of cGMPs violations on which Plaintiff relies are wholly conclusory.  For example, Plaintiff argues in his opposition that he plausibly pleaded that the product is adulterated because he "alleges that that [sic] the Products were manufactured in violation of cGMPs, which, in turn, resulted in the presence of benzene and rendered them injurious to consumer health . . . ."  Opp. at 22.  In support of this contention, Plaintiff cites to one paragraph in the Complaint.  That paragraph is nothing more than a threadbare recital of the elements of adulteration:

> Before being sold to the public, the BPO Product must be made in conformity with current good manufacturing practices and must conform to quality, safety, and purity specifications. Under the FDCA, a drug is adulterated "if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packaging, or holding do not confirm [sic] to or are not operated or administered in conformity with current good manufacturing practice . . . ."

*See* Compl. ¶ 47 (ellipses in original).  It is well settled that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Plaintiff's pleading does just that.[22]  Accordingly,

---

[22] Other conclusory citations about adulteration are peppered throughout the Complaint.  *See generally* Compl. ¶ 50 ("It is also illegal to distribute benzene contaminated drug products under New York state law.  For example, in New York, '[a]

Plaintiff's conclusory allegation alone is insufficient to establish that Defendant violated the cGMPs.

Nor can the Court "reasonably infer that Defendant violated one or more of the enumerated regulations that ultimately resulted in the distribution of a defective product to the market." Opp. at 2. In support of this inference, Plaintiff alleges at most that "[h]ad Defendant adequately tested its BPO Products for benzene and other carcinogens and impurities, it would have discovered its Products contain benzene and/or degrade to form benzene at levels above 2 ppm . . . ." Compl. ¶ 81. Plaintiff therefore seeks to triangulate a cGMPs violation based on the end product. This inference is not plausible: the results of testing a product off the shelf, post-sale, does not support an inference that Defendant violated the cGMPs. *Cf. Weber v. Allergan, Inc.*, 940 F.3d 1106, 1114 (9th Cir. 2019) ("[T]he mere evidence suggesting that [a device] was defective does not show that [the defendant] failed to comply with the FDA's Current Good Manufacturing Practices."); *Ebrahimi v. Mentor Worldwide LLC*, 804 F. App'x 871, 872 (9th Cir. 2020) (rejecting the argument that "the court can plausibly infer that [the defendant] must have violated at least one of the FDA's CGMPs by not catching [the alleged defect in an implant]") (citing *Weber*, 940 F.3d at 1114); *see also O'Dea v. RB Health (US) LLC*, 2025 WL 368969, at *3 (C.D. Cal. Jan. 13, 2025) (rejecting the same argument made by Plaintiff that a "conclusory allegation on information and belief that the presence of benzene 'resulted from Defendants' failure to comply with CGMPs,' does not plausibly identify a specific violation" of the cGMPs). The inference is particularly implausible in light of the substantial allegations contained in the Complaint concerning the propensity of benzoyl peroxide-based products to degrade to form benzene. *See* Compl. ¶¶ 37–46, 63–75; *see generally Iqbal*, 556 U.S at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific

---

drug . . . shall be deemed to be adulterated: (1) If it consists in whole or in part of any filthy, putrid, or decomposed substance; or (2) if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health."); *id.* ¶ 54 ("The manufacture of any misbranded or adulterated drug is prohibited under federal law and New York state law"); *id.* ¶ 55 (reciting the elements of the Education Law).

task that requires the reviewing court to draw on its judicial experience and common sense.").

At bottom, as pleaded, Plaintiff's negligence *per se* claim is based on the proposition that an FDA-approved active ingredient, benzoyl peroxide, systematically degrades into an unsafe byproduct, benzene. Plaintiff therefore seeks to use state law to make acne products made with benzoyl peroxide safer "than the model the FDA has approved," which "disrupts the federal scheme . . . ." *Riegel,* 552 U.S. 312, 325 (2008).[23] Plaintiff has not, therefore, plausibly pleaded its way through the narrow gap necessary to escape preemption.

In sum, Plaintiff's Section 350, fraud, and negligence *per se* claims based on the Benzene Omissions, and his negligence *per se* claim based on the allegation that benzoyl peroxide degraded into greater than 2 ppm of benzene, are each preempted. The only remaining claims are Plaintiff's Section 350 and fraud claims based on any alleged affirmative misrepresentations made on the BPO Product's label. The Court now turns to the merits of those remaining claims.

### B.  Plaintiff Does Not Plausibly State a Claim for a Violation of Section 350 Based on Any Affirmative Misstatement

Because Plaintiff has not alleged that Defendant's BPO Product contained any affirmative misrepresentation that would mislead a reasonable consumer, Plaintiff has not plausibly stated a claim under Section 350.[24] Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." Section 350.[25] To state a claim

---

[23] As the Supreme Court has explained:  "[A] state statute, or a regulation adopted by a state agency, could at least be expected to apply cost-benefit analysis similar to that applied by the experts at the FDA:  How many more lives will be saved by a device which, along with its greater effectiveness, brings a greater risk of harm? A jury, on the other hand, sees only the cost of a more dangerous design, and is not concerned with its benefits."  *Riegel,* 552 U.S. at 325.

[24] Claims brought under Section 350 of the New York General Business Law are "not subject to the pleading-with-particularity requirements of Rule 9(b)."  *Colpitts v. Blue Diamond Growers,* 527 F. Supp. 3d 562, 577 (S.D.N.Y. 2021) (citations and internal quotation marks omitted).  Such claims "need only meet the bare-bones notice-pleading requirements of Rule 8(a)."  *Id.* (citations and internal quotation marks omitted).

[25] "The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to [General Business Law § 349]."  *Goshen v. Mut. Life Ins. Co. of New York,* 98 N.Y.2d 314, 324 n.1 (2002); *see also Orlander,* 802 F.3d at 300 ("To successfully assert a claim under either section," namely General Business Law § 349 or § 350, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."); *see also* D*uran v. Henkel of Am., Inc.,* 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (same).

for a violation of Section 350, "a plaintiff must allege 'that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.,* 18 N.Y.3d 940, 941 (2012)).[26]

"A plaintiff must plausibly allege that the deceptive conduct was likely to mislead a reasonable consumer acting reasonably under the circumstances." *Mantikas v. Kellogg Co.*, 910 F.3d 633, 636 (2d Cir. 2018) (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013)). This is an objective standard. *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 26. The question is not whether the plaintiff himself was misled, but whether the alleged conduct "would objectively [mislead] a reasonable consumer." *Orlander*, 802 F.3d at 301; *accord Oswego Laborers*, 85 N.Y.2d at 26 (adopting "an objective definition of deceptive acts and practices, whether representations or omissions, limited to those likely to mislead a reasonable consumer"); *Randolph v. Mondelez Glob. LLC*, 2022 WL 953301, at *3 (S.D.N.Y. Mar. 30, 2022) (noting that plaintiff's allegations regarding his "personal expectations" were "irrelevant" because they did not speak to whether a reasonable consumer acting reasonably under the circumstances would be misled) (collecting cases).

"In determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial." *Mantikas*, 910 F.3d at 636 (quoting *Fink*, 714 F.3d at 742). The Court "therefore consider[s] the challenged advertisement as a whole, including disclaimers and qualifying language." *Id.* "[U]nder certain circumstances, the presence of a disclaimer or similar clarifying language may defeat a claim of deception." *Fink*, 714 F.3d at 742.

Whether a defendant's conduct was materially misleading "may be determined as a matter of law or fact as individual cases require." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v.*

---

[26] In this case, Defendant does not dispute that it engaged in consumer-oriented conduct or that Plaintiff was injured.

*Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 178 (2021) (quoting *Oswego Laborers*, 85 N.Y.2d at 26) (parentheses omitted).  The "inquiry is generally a question of fact not suited for resolution at the motion to dismiss stage."  *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (collecting cases).  Still, "[i]t is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer. *Fink*, 714 F.3d at 741.  A plaintiff must do more than plausibly allege that a "label might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner."  *Bustamante v. KIND, LLC*, 100 F.4th 419, 426 (2d Cir. 2024) (quotation omitted).  Instead, a plaintiff must plausibly allege "a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled."  *Id.* (quotation omitted); *accord, e.g.*, *Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 242 (S.D.N.Y. 2020).

Plaintiff's claim fails as a matter of law because he does not plausibly plead the existence of any misrepresentation, let alone one that would mislead a reasonable consumer.  Plaintiff's non-preempted Section 350 claim rests on his contention that—based on no particular statement, symbol, or any other identifiable reason—he "reviewed" the BPO Product's labels and disclosures and "understood" them to be false "representations and warranties by the manufacturer that the BPO Product was properly manufactured, free from defects, safe for its intended use, and not adulterated or misbranded."  Compl. ¶ 8.  Because the Complaint does not allege that the BPO Product's label allegedly contained any such representations, Plaintiff's claim fails.

At the outset, Plaintiff concedes that he has not asserted any actionable misrepresentation. "A party may be deemed to concede an argument by failing to address it in an opposition brief." *Curry Mgmt. Corp., N.A.*, 643 F. Supp. 3d at 426.  Defendant expressly argues that "Plaintiff has not stated an actionable affirmative misrepresentation because he has not alleged [] a specific, non-generalized statement by THDG in its labeling or advertising . . . [t]he Complaint does not point to

one concrete example of such misrepresentations . . . ." Mem. at 15. Faced with this argument, Plaintiff failed to identify any representations on the label, or otherwise explain why he "understood" the label as making certain representations. Plaintiff argued why each of the alleged "misstatements"—that the product failed to comply with federal and state law, that the product is unsafe, and that the Defendant failed to comply with cGMPs—were false. *See* Opp. at 15–16. But he did not respond to Defendant's argument that Plaintiff never identified any misstatement on the label to begin with.

Even if Plaintiff had not conceded the point, his Complaint still fails to plausibly plead that a reasonable consumer would have been misled by the BPO Product's label. "A plaintiff does not have a claim under the GBL just because she comes away from an advertisement with an incorrect impression. That impression must be reasonably traceable to a misleading statement from the defendant." *Harris v. Pfizer Inc.*, 586 F. Supp. 3d 231, 243–44 (S.D.N.Y. 2022); *see also Woods v. Maytag Co.*, 2010 WL 4314313, at *16 (E.D.N.Y. Nov. 2, 2010) (citing *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 100 (S.D.N.Y 1997)) ("[G]eneral references to advertisements and statements will not be sufficient to allege a deceptive act or practice").

"[C]ourts in this District have dismissed claims where nothing in the label states or implies" the inference drawn by a plaintiff bringing a claim under Section 350. *Brown v. Kellogg Sales Co.*, 2022 WL 992627, at *4 (S.D.N.Y. Mar. 31, 2022) (quotations and alterations omitted). In *Harris v. Pfizer Inc.*, for example, the court dismissed Plaintiff's Section 350 claim alleging that a drug's listing of one active ingredient, Varenicline, was a misstatement that the product did not contain another, unlisted ingredient because "[i]t is not enough to allege that the plaintiffs inferred from [the] label" something that was not true. 586 F. Supp. 3d at 243–44. In *Brown v. Kellogg Sales Co.*, 2022 WL 992627 (S.D.N.Y. Mar. 31, 2022), the court dismissed a Section 349 claim alleging that a "Frosted Strawberry" label misleadingly implied that a product only contained strawberry flavoring, *id.* at *1,

because "nothing in the label state[d] or implie[d] that the product's flavor [was] derived entirely from [strawberries]," and there was "no 'only' or 'exclusively' modifier before the phrase 'Strawberry,'" *id.* at *4 (quotations and alterations omitted).[27]

The label at issue here asserts even less about the BPO Product than the labels at issue in *Harris* and *Brown*. Again, Plaintiff does not allege anywhere that the BPO Product's label or other disclosures made any misstatements; they made no promises or implications that the product was FDA approved, or complied with all federal cGMPs, for example. *Cf. Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir. 1993) (rejecting in the context of whether a defendant falsely asserted that it was FDA-compliant based on the "contentions that the very *act* of placing a drug on the market, with standard package inserts often used for FDA-approved drugs, somehow implies (falsely) that the drug had been 'properly approved by the FDA'"). Plaintiff alleges no specific untrue assertions were made on the label about the product. Consequently, Plaintiff has not plausibly pleaded a claim under Section 350.

### C.  Plaintiff Does Not Plausibly State a Claim for Fraud

Plaintiff does not state a claim for common law fraud, either. His claim is preempted to the extent it rests on a failure to disclose the Benzene Omissions, and he has not otherwise adequately pleaded a material misrepresentation or scienter. "Under New York law, fraud requires proof of (1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015) (emphasis added). "At the pleading

---

[27] *See also, e.g., Wallace v. Wise Foods, Inc.*, No. 20-cv-6831 (JPO), 2021 WL 3163599, at *2 (S.D.N.Y. July 26, 2021) (dismissing Section 349 claim alleging that "Cheddar & Sour Cream Flavored" label on chips packaging misleadingly implied that the chips' flavor was derived exclusively from cheddar or sour cream and that the chips were flavored only with natural ingredients, because the label did not make those assertions); *Pichardo v. Only What You Need, Inc.*, No. 20-cv-493 (VEC), 2020 WL 6323775, at *5 (S.D.N.Y. Oct. 27, 2020) (same, holding that "Smooth Vanilla" label did not state or imply that vanilla extract was the exclusive flavoring ingredient); *Barreto v. Westbrae Nat., Inc.*, 518 F. Supp. 3d 795, 802–03 (S.D.N.Y. 2021) (same, holding that "Natural Vanilla Flavor With Other Natural Flavors" label did not state or imply that "natural vanilla is the predominant source of the vanilla flavor").

stage, to withstand a Rule 12(b)(6) challenge in federal court, Plaintiffs must 'assert facts that plausibly support the inference of fraud.'" *Id.*

"Additionally, in conjunction with the facial plausibility standard of Rule 12(b)(6), [a plaintiff] must satisfy the heightened pleading standard set forth in Rule 9(b), which reads: 'In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'" *Id.* at 171. "In essence, Rule 9(b) places two further burdens on fraud plaintiffs—the first goes to the pleading of the circumstances of the fraud, the second to the pleading of the defendant's mental state." *Id.* "As to the first, we have held that the complaint must '(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'" *Id.* "As to the second, though mental states may be pleaded 'generally,' [a plaintiff] must nonetheless allege facts 'that give rise to a strong inference of fraudulent intent.'" *Id.*

Here, as with its Section 350 claim, Plaintiff has not plausibly pleaded that Defendant made any material misrepresentation. *See Bermudez v. Colgate-Palmolive Co.,* 667 F. Supp. 3d 24, 41 (S.D.N.Y. 2023) (dismissing a fraud claim because the complaint "does not plead a false or misleading act," which was also why the court dismissed a parallel claim under Section 349); *Dwyer v. Allbirds, Inc.,* 598 F. Supp. 3d 137, 154 (S.D.N.Y. 2022) (dismissing fraud claims "[b]ecause [the court] already determined that Plaintiff fails to allege that the statements, advertising, and practices relating to the Product would be likely to deceive or mislead a reasonable consumer").

Even if he had identified a misstatement, as an additional basis to dismiss, Plaintiff has not alleged sufficient facts to give rise to a strong inference of fraudulent intent. *See Loreley,* 797 F.3d at 171. Plaintiff's argument in support of scienter is entirely conclusory, alleging that "there is strong

circumstantial evidence that Defendant committed such acts knowingly and/or recklessly, as alleged."  Opp. at 21 (citing Compl. ¶ 82, which states in conclusory fashion that "Defendant knowingly, recklessly, or at least negligently, introduced the contaminated, adulterated, and misbranded BPO Products into the U.S. market.").  Such bare allegations are inadequate.  *See, e.g., Harris*, 586 F. Supp. 3d at 241 (quoting *Loreley*, 797 F.3d at 176) (concluding that a complaint that merely alleged that Defendant may have known that their representation was false, not that Defendant actually knew of its falsity or intended to induce reliance based on said falsity).

Nor does Plaintiff's Complaint adequately "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent" as required to state a claim.  *See Loreley*, 797 F.3d at 171.  Although the Complaint purports to allege the so-called who, what, where, when, why, and how underpinning his fraud claim, the factual basis for each category is wholly conclusory.  For example, with respect to the "how," Plaintiff alleges: "Defendant made material misrepresentations, false statements and/or omissions regarding the presence of benzene in its BPO Products by making express and/or implicit representations in the above-referenced materials their its Products were safe and by omitting any facts in its marketing, labeling, and/or descriptions of its Products that would inform a consumer as to the presence of excessive levels of benzene and/or that its Product can degrade to form excessive levels of benzene."  *Id.* ¶ 133(e).  Each of the other categories are similarly imprecise and conclusory.  Particularly in light of the heightened pleading standard for fraud and based on the conclusory nature of Plaintiff's allegations, Plaintiff has not sufficiently pleaded his common law fraud claim.

## V.    LEAVE TO AMEND

Plaintiff is granted leave to amend his complaint.  It is the "usual practice" upon dismissing a complaint "to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.

1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  That is especially true where, as here, a plaintiff has not yet had the opportunity to amend the complaint with the benefit of a ruling from the Court.  S*ee Loreley*, 797 F.3d at 190 ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").  However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 224–25 (2d Cir. 2017).  "In general, when assessing whether an amended complaint would state a claim, we consider 'the proposed amendments along with the remainder of the complaint.'" *Pyskaty*, 856 F.3d at 225.  "Although courts commonly look to proposed amendments to determine futility, . . . courts may consider all possible amendments when determining futility." *Panther Partners Inc. v. Ikanos Commun., Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order).

Here, Plaintiff fails to adequately allege facts sufficient to plausibly plead a non-preempted claim for a violation of Section 350, fraud, and negligence *per se* based on any affirmative misrepresentations contained on the label of the BPO Product, or based on the sale of an adulterated or misbranded product as a result of any manufacturing defect.  The Court cannot conclude that further amendment would not cure these deficiencies.  The Court therefore grants Plaintiff leave to file a second amended complaint solely to cure the deficiencies identified with respect to these claims no later than 30 days from the date of this order.  *See Loreley*, 797 F.3d at 191.

## VI.    CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED.  The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 37 and 39.

SO ORDERED.

Dated:  September 26, 2025
New York, New York

_____
GREGORY H. WOODS
United States District Judge